UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE:     CATHERINE A. HENRY,           :      Chapter 13
                                         :
            Debtor.                      :      Bky. No.  14-19642 ELF

# M E M O R A N D U M

## I.  INTRODUCTION

On December 8, 2014, Dr. Catherine Henry ("the Debtor") filed a chapter 13 bankruptcy case. Her chapter 13 plan proposes to pay all allowed unsecured claims in full. (Amended Plan ¶ 4.d.1.) (Doc. # 36).

On May 14, 2015, Dr. Lynn Azzara ("Dr. Azzara") filed a proof of claim, asserting an unsecured claim in the amount of $38,529.70. On July 1, 2015, the Debtor filed an objection to the proof of claim ("the Objection"). (Doc. # 74).

The dispute arises out of a contract between Dr. Azzara and the Debtor pursuant to which the Debtor treated patients in Dr. Azzara's podiatry practice in return for certain promised compensation. Dr. Azzara's claim is based on her contention that the Debtor diverted patient co-pays and insurance receivables derived from the patients the Debtor treated and that those amounts exceeded the amount of compensation the Debtor was entitled to receive under the contract.

The Debtor concedes that she took some fees generated from her treatment of Dr. Azzara's patients, but denies she owes Dr. Azzara any money. She asserts that Dr. Azzara failed to pay her for the services she provided and that any amount she owes Dr. Azzara is less than what Dr. Azzara owes her.

-1-

Dr. Azzara represented herself in this contested matter. An all-day evidentiary hearing on the Objection was held on November 16, 2015.

For the reasons stated below, I will sustain the Objection and disallow Dr. Azzara's claim.

## II.  LEGAL PRINCIPLES GOVERNING OBJECTIONS TO PROOFS OF CLAIM

In analyzing the parties' respective burdens in connection with the adjudication of an objection to a proof of claim, bankruptcy courts must consider three (3) sources of law: the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and, of course, applicable case law. The basic legal principles governing the allowance and disallowance of proofs of claim are well established.

Section 502(a) of the Code provides that a proof of claim "is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). In the face of an objection to a proof of claim, the Third Circuit Court of Appeals has held that if the proof of claim alleges facts sufficient to support the legal liability asserted, the claimant's initial obligation to go forward is satisfied, i.e., the proof of claim itself makes out a prima facie case. The burden of production then shifts to the objector to offer evidence sufficient to negate the prima facie validity of the filed claim. In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir.1992).

Fed. R. Bankr. P. 3001(f) also addresses the evidentiary burdens in claims objection litigation. Rule 3001(f) provides: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." If a claimant complies with the rules of court, the proof of claim achieves prima facie evidentiary status

through Rule 3001(f). In effect, a proof of claim that complies with the rules of court serves as both a pleading and as trial evidence, even in the face of an objection to the claim. See In re O'Brien, 440 B.R. 654, 664 & nn.14-15 (Bankr. E.D. Pa. 2010). It follows that if the claimant's proof of claim satisfies Rule 3001(f), the burden of going forward with evidence contesting the validity or amount of the claim shifts to the objector. To meet this burden, the objector's evidence "if believed, [must] refute at least one of the allegations that is essential to the claim's legal sufficiency." Allegheny Int'l, 954 F.2d at 173-74.

In a claims objection contested matter in which a proof of claim is prima facie valid and the objector meets its burden of production, the ultimate burden of proof remains with the claimant. See Allegheny Int'l, 954 F.2d at 174; In re Gimelson, 2004 WL 2713059, at *13 (E.D. Pa. Nov. 23, 2004); In re Galloway, 220 B.R. 236, 244 (Bankr. E.D. Pa. 1998). Thus, once the objector has presented evidence, the claimant may then need to offer additional evidence to carry its burden of persuasion. See U.S. (I.R.S.) v. Baskin & Sears, P.C., 207 B.R. 84, 86 (E.D. Pa. 1997) ("[a]s in non-bankruptcy law, bankruptcy claimants seeking damages must prove their entitlement").

### III. FACTS

#### A.

At the hearing in this matter, four (4) witnesses testified: (1) Dr. Azzara; (2) Dr. Azzara's sister, Cheryl Eklund; (3) the Debtor; and (4) a paralegal from the Debtor's counsel's law firm, Susan Arsenich. In addition, several documents, some of them lengthy, were admitted into evidence.

From this record, certain facts emerged clearly. Other facts, some of which could have been material, were not developed adequately by the parties. The poor record is salient because both parties maintained business records that likely would have been probative on the key issues.[1]

In Part III.B. of this Memorandum are my findings of fact. To the extent the witnesses offered conflicting testimony on issues relevant to the disposition of this matter, my findings reflect my resolution of those conflicts based on my assessment of the witnesses' demeanor, motivations, credibility and related factors.

**B.**

**1.**

Both the Debtor and Dr. Azzara are podiatrists. Prior to January 2014, each maintained separate practices – the Debtor in Southampton, PA and Dr. Azzara in Warrington, PA.

In May 2013, the Debtor responded to an advertisement in which Dr. Azzara was offering to sell her podiatry practice. (N.T. at 6). They never reached an agreement for the sale of the practice to the Debtor. However, in December 2013, they entered into an oral contract pursuant to which the Debtor agreed to see patients in Dr. Azzara's office and, in return, Dr. Azzara agreed to pay the Debtor forty percent (40%) of the revenues generated by the Debtor's treatment

---

[1] Dr. Azzara's decision to represent herself in this contested matter did not serve her well. She was "at sea" during the entire process, both in the pretrial proceedings (which involved discovery and various case management issues) and in the hearing itself. Even with additional leeway given to her as a pro se litigant during the hearing, she did not grasp even the most rudimentary principles of trial practice. She was incapable of generating a coherent evidentiary record. This resulted in an all-day, inefficient, unnecessarily contentious hearing and a muddled record.

of patients in Dr. Azzara's practice. (Id. at 7).

Dr. Azzara's practice had two (2) main sources of revenue: co-payments from patients and reimbursements from insurance companies or medicare. (Id. at 23). Following a patient visit, an invoice was submitted to the insurance company. (Id. at 33). Approximately two (2) weeks later, the insurance company would provide an Explanation of Benefits ("EOB"). (N.T. at 33). The EOB states the doctor's full charge for the services rendered, the amount of any co-payment paid by the patient, and the net reimbursement to the doctor. (N.T. at 9, 13-14). Approximately three (3) weeks after the issuance of the EOB, the insurance company would send the reimbursement check to the doctor. (Id. at 34).

Neither party developed a record regarding certain significant aspects of their agreement. At one point in the testimony, Dr. Azzara seemed to acknowledge that she was responsible for payment of all business expenses. (N.T. at 185). For her part, the Debtor testified that she was to receive "40 percent of the accounts receivable of the patients I saw," (N.T. 7), without explaining precisely how her forty percent (40%) entitlement was to be measured or the timing of the required payments.

From all the circumstances, I infer that the parties intended that Dr. Azzara would pay over to the Debtor, on a periodic basis, forty percent (40%) of all revenues received shortly after she received them. Since a significant component of the revenue stream was derived from the insurance reimbursements, I further infer that there was an implied agreement that Dr. Azzara would promptly submit bills to the insurance companies for reimbursement. See generally Restatement (Second) of Contracts § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a

determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court"); Crawford's Auto Ctr., Inc. v. Com., Pennsylvania State Police, 655 A.2d 1064, 1069 (Pa. Commw. Ct. 1995).

**2.**

The Debtor worked in Dr. Azzara's office from January 17, 2014 to July 8, 2014. This time frame can be divided into two (2) periods: from January 17, 2014 through March 31, 2014 ("the First Period") and from April 1, 2014 to July 8, 2014 ("the Second Period").[2]

Dr. Azzara's billing software was used for patient invoicing during some or all of the First Period. See n.2, supra. When she handled the patient billing, Dr. Azzara received the patient co-payments, billed the insurance companies and received the insurance reimbursements.

During the First Period, the Debtor saw approximately eighteen (18) to twenty-eight (28) patients per day. (Id. at 12). After two weeks, the Debtor saw all of the patients in the office. (Id. at 24). The Debtor received a net payment of only $400.00 during the First Period. (Id. at

---

[2] The difference between the two (2) periods is attributable to a material shift in billing practices. Dr. Azzara was hospitalized for approximately one (1) month beginning March 31, 2014. Upon Dr. Azzara's hospitalization, the Debtor "took over" the office and began billing all of the Dr. Azzara's patients who she saw, under her own name using her own billing software. (Id. at 25, 27).

I am aware that there was some conflicting evidence on this point. Dr. Azzara claimed that after just a few weeks into the First Period, the Debtor began using her own billing software. The Debtor denied this and asserted that she did not start using her own software until the Second Period. (N.T. at 29). The exact point in time when this occurred is not material to the outcome of this contested matter. I am using April 1, 2014 as the starting point for "Second Period" because it represents the point in time when both parties agree that the Debtor took over the billing.

28-29).[3]

During the Second Period, the Debtor used her own billing software to bill insurance companies and account for co-payments and reimbursements. (N.T. at 29).[4] She deposited patient co-payments and insurance reimbursements directly into her own business checking account. (N.T. at 31-32, 34-35).

The Debtor did not pay Dr. Azzara any of the revenue received for patients she treated during the Second Period. (N.T. at 40). Without offering supporting documentary evidence, she maintains that the amount she should have paid Dr. Azzara from the revenue generated during the Second Period (i.e., sixty percent (60%)), was approximately equal to the compensation (i.e., forty percent (40%) of the revenue), that Dr. Azzara failed to pay her during the First Period. (Id. at 41-42, 275).

## IV. DISCUSSION

The Debtor met her initial burden of production by proving that Dr. Azzara breached their agreement by failing to compensate the Debtor during the First Period. This evidence was sufficient to overcome the prima facie validity of Dr. Azzara's proof of claim, leaving the

---

[3] Dr. Azzara initially made a payment of $2,100 to the Debtor, but the Debtor returned $1,700 to Dr. Azzara. (N.T.. at 7-8).

[4] The Debtor's decision to shift the billing records from Dr. Azzara's system to her own may have been motivated by a concern that the administrative billing tasks in Dr. Azzara's office would go undone in her absence, thereby delaying the flow of insurance reimbursements and the potential for her to receive her compensation in a timely fashion. Or, it may have been a response to Dr. Azzara's failure to pay the agreed compensation that fell due during the First Period. The Debtor's precise reasons for her action are not material.

-7-

ultimate burden of persuasion with Dr. Azzara.[5]

Of course, the Debtor responded to Dr. Azzara's breach by continuing to perform under the contract. However, the Debtor then breached her obligation to Dr. Azzara by failing to account for and pay over sixty percent (60%) of the revenue she generated during the Second Period.

Thus, the outcome of this contested matter depends on the answer to one (1) question:

> Has Dr. Azzara met her burden of proving that her share of the revenue generated during the Second Period exceeded the amount she was obliged to, but did not, pay the Debtor during the First Period.

See 10-53 Corbin on Contracts §53.4 (LexisNexis 2015) ("A partial breach by one party . . . does not justify the other party's subsequent failure to perform; both parties may be guilty of breaches, each having a right to damages").

Neither party gathered and organized the available documentation (EOB's and bank records) for both periods to aid the court in making what could have been a relatively mechanical determination. But, Dr. Azzara bore the burden of proof and she failed to meet that burden.

Dr. Azzara failed to generate from her own records, and failed to develop in discovery and present from the Debtor's records, the available information to establish the amount of revenue subject to division under the parties' contract. Instead, she has attempted to calculate her 60% share of revenue by multiplying the number of patient charts the Debtor completed by the average procedure charge, as calculated by the Debtor's billing software.

---

[5] The evidence established that the Debtor treated a sufficient number of patients during the First Period, and that enough time passed after she treated them, to warrant the inference that Dr. Azzara should have paid her more than a net $400.00. Given the number of patients the Debtor treated, it is unlikely that Dr. Azzara collected only $1,000.00 during the First Period for the services provided by the Debtor.

More specifically, she contends that the average reimbursement per patient is approximately $85.93. (See Ex. C-2). She multiplied that amount by 893 (representing the number of patients she asserts the Debtor saw). (N.T. at 224-25). That yields a gross revenue amount of $76,735.49. She asserts that she is entitled to sixty percent (60%) of that number, or $46,041.29.

Dr. Azzara's evidence was not persuasive. (N.T. at 282-84).

This approach is problematic for two (2) reasons.

First, Dr, Azzara employed a roundabout method of estimating the revenue, which requires that I accept the assumption that the so-called average reimbursement was paid for every patient that the Debtor saw. A methodology that employs a calculation based on average reimbursements may be appropriate as a means to "fill in the blanks" when actual data is unavailable. But, it is less clear that this methodology is appropriate when the actual revenue could have been calculated with relative ease by reference to the EOB's and bank records.

Indeed, for the period in which her own billing software was used, Dr. Azzara had all of the information needed to calculate how much revenue the Debtor generated. She presented almost nothing that would permit a finding as to the Debtor's entitlement during the First Period or any portion thereof.[6] For the period of time in which the Debtor's billing software was used, the Debtor could have obtained the same information through some focused discovery. She did not do that either.

I am reluctant to make the findings Dr. Azzara seeks based on an abstract calculation

---

[6] In fact, Dr. Azzara failed to produce all but 9 EOB's. (See N.T. at 217-19, 253-54; Ex. C-4).

when evidence existed that could have yielded actual information regarding the revenues generated by the Debtor's work.  See generally In re Applications for Unclaimed Funds Submitted in Cases Listed on Exhibit ""A", 341 B.R. 65, 75 (Bankr. N.D. Ga. 2005) (court declines to wade through the documents offered to establish a fact "when there appear to be far more direct ways to establish the necessary authorization").

Second, and perhaps more importantly, the Debtor has persuasively critiqued the validity of Dr. Azzara's damages calculation.

It is not clear from the documentation presented (Ex. C-2, specifically) whether the $85.93 "average" represents the average reimbursement or merely the average charge submitted to the insurance companies, which was then reimbursed at a much lower rate.  Indeed, the Debtor suggests that, on their face, the documents submitted support the conclusion that the actual reimbursements the practice realized averaged approximately twenty-five (25%) of the average charge.  (N.T. at 269-70).[7]

This difference is critical.  The Debtor contends that, even employing the rest of Dr. Azzara's methodology, Dr. Azzara's entitlement was approximately 25% of the claimed $46,041.29, or $11,510.32.  The Debtor then contends that her unpaid compensation and various amounts that she advanced for supplies and expenses offset Dr. Azzara's claim.

It is difficult, if not impossible, to ascertain from the face of the documents in evidence

---

[7] There also were 9 EOB's in the record, all generated during the First Period. (See Ex. C-4). However, even putting aside the fact that the EOB's were generated when Dr. Azzara was doing the billing (and not the Debtor),this is far too small a sample from which to draw a reliable inference regarding average reimbursement.  Even within the Exhibit, the percentage of the reimbursements (as compared to the amount billed) varied widely, apparently depending on the type of procedure, making it difficult to ascertain the existence of any "average" from the face of the Exhibit.

and the paucity of related testimony, whether Dr. Azzara's assumption that the Debtor received $85.93 for every patient the Debtor saw is accurate, or whether she received only one-quarter of that amount, as the Debtor contends. Dr. Azzara bears the burden of proof and did not meet that burden on this issue. Therefore, she has not proven the facts that serve as the foundation of her methodology for calculating the damages she claims she suffered. See, e.g., In re Rawson Food Serv., Inc., 846 F.2d 1343, 1348 (11th Cir.1988) (if evidence is in equipoise, the one with the burden of proof loses); In re Castle Arch Real Estate Inv. Co., LLC, 2013 WL 1603319, at *8 (Bankr. D. Utah Apr. 15, 2013) ("Even equipoise of the evidence is not enough for the party with the burden of proof to prevail").

In the end, it is impossible to determine whether the voluminous business records Dr. Azzara deposited in the record support her claim. She did not filter the records or provide testimony to explain or analyze the raw data contained in the documents to show how they quantify how much revenue the Debtor generated by treating patients in Dr. Azzara's practice. Candidly, I cannot tell, one way or another, whether the Debtor or Dr. Azzara received more than she was entitled to under the contract. Dr. Azzara, as the claimant, bears the burden of proof in establishing her claim. She did not meet her burden. Therefore, the Debtor's objection to the claim must be sustained.

## V. CONCLUSION

The ruling here obviously will disappoint Dr. Azzara. Had she engaged counsel, she may have succeeded in establishing her claim, at least in part. But, her inability to present a coherent record in support of her claim compels the result. In the end, this case illustrates the risk of self-representation in legal proceedings.

For the reasons set forth above, the Debtor's objection to Dr. Azzara' proof of claim will be sustained and Dr. Azzara's claim will be disallowed.

**Date: March 2, 2016**

**ERIC L. FRANK
CHIEF U.S. BANKRUPTCY JUDGE**